# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| CROMPTON GREAVES, LTD., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-08-1774 |
| | § | |
| SHIPPERS STEVEDORING COMPANY, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM AND OPINION

This opinion addresses the following motions:

1.  Shippers Stevedoring moved for partial summary judgment that the one-year statute of limitations in the Carriage of Goods at Sea Act ("COGSA") bars Crompton Greaves's claims, or alternatively, limits its damages to $500.00. (Docket Entry No. 65). Crompton Greaves responded, (Docket Entry No. 69), and Shippers Stevedoring replied, (Docket Entry No. 70).

2.  Shippers Stevedoring moved to strike exhibits submitted by Crompton Greaves in response to Shippers Stevedoring's motion for summary judgment, (Docket Entry No. 71). Crompton Greaves responded, (Docket Entry No. 80), and Shippers Stevedoring replied, (Docket Entry No. 82).

3.  Shippers Stevedoring moved for summary judgment on all of Crompton Greaves's claims, (Docket Entry No. 74). Crompton Greaves responded, (Docket Entry No. 87); Shippers Stevedoring replied, (Docket Entry No. 95); Crompton Greaves surreplied, (Docket Entry No. 106); and Shippers Stevedoring responded to the surreply, (Docket Entry No. 111).

4.  Shippers Stevedoring moved for an adverse inference instruction against Crompton Greaves, (Docket Entry No. 77). Crompton Greaves responded, (Docket Entry No. 85), and Shippers Stevedoring replied, (Docket Entry No. 103).

5.  Crompton Greaves moved for summary judgment on liability, (Docket Entry No. 76). Shippers Stevedoring responded, (Docket Entry No. 84).

6.  Crompton Greaves moved to sever Shippers Stevedoring's third-party complaint against Union Pacific Railroad, (Docket Entry Nos. 75, 90). Union Pacific joined the

motion, (Docket Entry No. 91), and Shippers Stevedoring responded, (Docket Entry No. 83).

7.     Union Pacific moved for summary judgment on Shippers Stevedoring's claims, (Docket Entry No. 99).  Shippers Stevedoring responded, (Docket Entry No. 104), and Union Pacific supplemented, (Docket Entry No. 107).

Based on the motions, responses, and replies; the summary judgment record; and the applicable law, this court rules as follows:

- Shippers Stevedoring's motion for partial summary judgment that COGSA's one-year statute of limitations bars Compton Greaves's claims or that COGSA limits damages to $500.00 is denied.  (Docket Entry No. 65).

- Shippers Stevedoring's motion to strike is denied.  (Docket Entry No. 71).

- Shippers Stevedoring's motion for summary judgment on Crompton Greaves's claims is denied.  (Docket Entry No. 74).

- Shipper Stevedoring's motion for an adverse inference instruction is denied.  (Docket Entry No. 77).

- Crompton Greaves's motion for partial summary judgment on liability is denied. (Docket Entry No. 76).

- Crompton Greaves's and Union Pacific's motion to sever is denied.  (Docket Entries No. 75, 90).

- Union Pacific's motion for summary judgment that its damages are limited to $25,000.00 is granted.  The motion that Shippers Stevedoring does not have standing and that Shippers Stevedoring's claims are barred by limitations provision in Union Pacific's bill of lading is denied.  (Docket Entry No. 99).

The parties' arguments and the reasons for this court's rulings are discussed in detail below.

## I.     Background

This dispute arises from the shipment of a power transformer from India to the United States.

Crompton Greaves is an Indian corporation that manufactures and sells power transformers.

(Docket Entry No. 19, Amended Complaint, at 1).  Shippers Stevedoring is a Texas corporation that

provides stevedoring services at the Port of Houston, Texas.  Crompton Greaves alleges that Shippers Stevedoring is responsible for damaging a transformer that Crompton Greaves manufactured and shipped from India to Arizona through the Port of Houston.  The basis for Crompton Greaves's claims are recordings from a Shock-log device.  A Shock-log records "shocks" during transport by measuring force waves.  (Docket Entry No. 74, Ex. A., Sandeep Chakravarty Depo. at 30).  The Shock-log recorded shocks on March 7, 2007 and March 13, 2007, while the transformer was in Shippers Stevedoring's custody.

Shippers Stevedoring has also filed a third-party complaint for indemnification and contribution against Union Pacific Corporation, the rail company that transported the transformer from the Port of Houston to Arizona.  The basis for Shippers Stevedoring's claims against Union Pacific is a fourth shock recorded on March 31, 2007, when the transformer was in Union Pacific's custody.

Crompton Greaves manufactured the transformer for sale to Pauwels America, its wholly-owned American subsidiary.  Pauwels America in turn contracted to sell the transformer to Tucson Electric Company for use at a power station in Arizona.  Pauwels America and Tucson Electric agreed that title to the transformer would remain with Crompton Greaves until delivery.  (Docket Entry No. 65, Ex. 1, Sandeep Chakravarty Depo. at 21–22).

Crompton Greaves manufactured the transformer at its Bhopal, India plant.  Sandeep Chakravarty, a regional vice president and Crompton Greaves's designated corporate representative, testified that Crompton Greaves specially designed the transformer "to withstand various transportation and other forces."  (Docket Entry No. 87, Ex. 2, Sandeep Chakravarty Depo. at 107).  Crompton Greaves also affixed the Shock-log to the transformer before it was shipped.

Viswanathan Shivakumar, a deputy manager at the Bhopal plant, testified that before shipping the transformer, Crompton Greaves performed electrical-function tests recommended by the Institute of Electrical and Electronic Engineers (IEEE) and the American National Standards Institute (ANSI), professional organizations that set industry testing standards.  (Docket Entry No. 74, Ex. 1, Viswanathan Shivakumar Depo. at 63–66).  Shivakumar testified that these tests showed that the transformer functioned properly before shipment.  Shivakumar also testified that he personally attached, set, and calibrated the Shock-log on the transformer before the shipment.  (Docket Entry No. 87, Ex. 1, Viswanathan Shivakumar Depo. at 89, 98–99).  Shippers Stevedoring asserts that Crompton Greaves also attached a second shock recorder, a Logee 10, to the transformer.  Shippers Stevedoring bases this in part on testimony by Shivakumar that the transformer had multiple "shelves" designed to hold shock recorders.  (Docket Entry No. 77, Ex. D, Viswanathan Shivakumar Depo. at 142–43).  Crompton Greaves asserts that there was only one shock recorder attached, and Shivakumar's testimony is consistent.

Crompton Greaves hired National Shipping Company of Saudi Arabia (NSCSA) to ship the transformer from the Port of Mumbai, India to the Port of Houston, Texas.  To prepare for shipment, the transformer was placed on a mafi trailer.  A mafi trailer is a shorter version of a flatbed trailer with hard wheels.  Once on the mafi trailer, the transformer was chained down and covered with a tarp.  (Docket Entry No. 65, Ex. 1, Sandeep Chakravarty Depo. at 88, 97; Ex. 2).  It was then loaded onto NSCSA's vessel, the *M/V Saudi Diriyah*, for shipment to the Port of Houston.  (*Id.*).  Crompton Greaves asserts that the transformer was not damaged from the time it left the Bhopal plant until it arrived at the Port of Houston.

NSCSA issued a bill of lading for the shipment.[1]  The front of the bill of lading described the shipper, consignee, cargo, and cargo's intended voyage.  The bill of lading listed Crompton Greaves as the shipper and Pauwels America as the consignee.  The cargo was described as "1 uncrated main unit and 39 wooden cases" and a "Power Transformer, South Loop Substation." Houston, Texas was the port of discharge and Biehl & Company Lines Services in Houston, Texas was the "place of delivery."  Box 14, titled "For Transshipment to," was blank.  (Docket Entry No. 69, Ex. 2, Bill of Lading).

The back side of the bill of lading detailed rights, liabilities, and responsibilities.  Section 3 set out the "Carrier's Liability."  Subsection 3(b) stated: "TRADES TO OR FROM THE UNITED STATES: shall be subject to the United States Carriage of Goods Act ["COGSA"] of 1936 . . . which shall also apply to cargo on deck."[2]  (*Id.*).  Section 4 of the bill lading contained a "Himalaya Clause," extending the bill of lading's liability limitations to subcontractors.  Subsection 4(c) stated:

> If an action for loss or damage to the Goods is brought against the
> ship managers, operator, insurer, servant, independent contractor, or

---

[1]  "A bill of lading 'records that a carrier has received goods from the party that wishes to ship them, states the terms of carriage, and serves as evidence of the contract for carriage.'"  *Kawasaki Kisen Kaisah Ltd. v. Regal-Beloit Corp.*, 130 S. Ct. 2433, 2439 (2010) (quoting *Norfolk Southern R. Co. v. Kirby*, 543 U.S. 1, 18–19 (2004)).

[2]  COGSA was previously codified in the appendix to Title 46 of the U.S. Code.  When Title 46 was recodified in 2006 by Pub. L. 109-304, Oct. 6, 2006, 120 Stat. 1485, COGSA was not included except as a statutory note to the first section of the Harter Act, 46 U.S.C. § 30701.  *See* David W. Robertson & Michael F. Sturley, *Recent Developments in Admiralty and Maritime Law at the National Level and in the Fifth and Eleventh Circuits*, 32 TUL. MAR. L.J. 493, 500 (2008) (explaining the codification issues). COGSA was not repealed by the recodification.  *See, e.g.*, *Ambraco, Inc. v. Bossclip B.V.*, 570 F.3d 233, 237 (5th Cir. 2009) (applying COGSA).  COGSA limits a transporter's liability for loss or damage to cargo to $500.00 per package unless the shipper declares the value of the goods on the face of the bill of lading before shipment.  *See, e.g.*, *Brown & Root, Inc. v. M/V Peisander*, 648 F.2d 415, 420 (5th Cir. 1981) (noting that COGSA provides for "$500 per package unless the nature and value of the goods have been declared by the shipper").  COGSA also has a one-year statue of limitations for loss or damage claims that begins to run on the date of delivery.  COGSA § 3(6), 49 Stat. 1207 (1936), *reprinted in* note following 46 U.S.C. § 30701.

> subcontractor of the carrier or underlying carrier, including terminal operators, stevedores, carpenters, and watchmen, such persons shall be entitled to avail themselves of the defenses and limits of liability for which the Carrier is entitled to invoke under the contract.

(*Id.*).  Finally, Section 5 described the carrier's responsibilities.  Subsection 5(a), titled "Port to Port Shipment," stated:

> The Carrier shall be liable for goods from the time the Goods have passed over the Vessel's [ramp] at time of loading at the Port . . . until the time the Goods have passed over the Vessel's [ramp] at the time of discharging at the Port of Discharge . . . .  For goods to or from US Ports, the Carrier shall be liable from the time the good are received at the loading port until the time the goods have been delivered to the Merchant at the Port of Discharge.

(*Id.*).

Crompton Greaves employed Alomex, an interstate-freight forwarder, "to handle the inland portion of the carriage of the transformer," and employed Vision Logistics to coordinate the railcar transport.  (Docket Entry No. 69, at 3).  On February 8, 2007, Alomex emailed an invoice to Crompton Greaves.  The invoice stated, "From delivered free on mafi, unlashed at the port of Houston, till offloaded at Sahuarita, AZ we can give you a lump sum price of USD 145,800.00." (Docket Entry No. 69, Ex. 4).  Alomex in turn informed Shippers Stevedoring that it was expecting the shipment on the *M/V Saudi Diriyah* and instructed Shippers Stevedoring to arrange to transfer the transformer to a railcar.  (*Id.*, Ex. 5).

The *M/V Saudi Diriyah* arrived at the Port of Houston on March 1, 2007 and began discharging cargo at the Barbour's Cut Terminal the next day.  Shippers Stevedoring served as the stevedores for the discharge.  Captain W. Rego, a surveyor, was hired by Pauwels America and attended the discharge at its direction.  Rego's report notes no incidents.  (Docket Entry No. 65, Ex. 10, Vericlaim Report, at 5).

6

After discharge, Shippers Stevedoring drove the transformer to its terminal at the Port of Houston and parked it in an open yard.  (*Id.*, Ex. 6, Scott Butler Depo. at 20, 49).  The transformer remained there until March 12, 2007, when it was loaded onto a railcar.  (*Id.*, Ex. 8, Derlin Marsh Depo. at 100–01).  On March 7, 2007 at approximately noon, the Shock-log on the transformer recorded the first shock.  Shippers Stevedoring claims that on March 7, the transformer was idle in the yard.  Every Shippers Stevedoring employee who has been deposed denied moving the transformer between March 7 and March 12.  Internal records produced by Shippers Stevedoring do not note any attempts to move the transformer during that time.

Captain Rego and Dale Schabel, a Pauwels America representative, were at the Shippers Stevedoring yard on March 7 to check the cargo.  Chakravarty testified that they inspected the cargo in the morning.  (Docket Entry No. 74, Ex. A, 215, 217).  Captain Rego testified that he took pictures of the transformer and that Schabel noticed some minor damage on the exterior.  (Docket Entry No. 74, Ex. C, Captain Rego Depo. at 63–64).  One photograph taken by Captain Rego shows a transformer equipped with two shock recorders.  Captain Rego testified that he was not sure whether that photograph was of the transformer at issue in this litigation.  (Docket Entry No. 85, Ex. 1, Captain Rego Depo. at 52).  Captain Rego and Schabel did not check the Shock-log or perform an internal inspection of the transformer.  Captain Rego's report did not describe any significant damage to the transformer, though it did note damage to crates shipped with the transformer.  (Docket Entry No. 65, Ex. 10, Vericlaim Report, at 5).  Captain Rego testified that he did not see anyone working on the transformer.

Crompton Greaves claims that the Shock-log data is consistent with Shippers Stevedoring moving the transformer on March 7, 2007 and causing damage.  Crompton Greaves bases its claim

on evidence that Shippers Stevedoring expected the railcar to arrive on March 8, 2007 and tried to move the transformer on March 7 to prepare. Derlin Marsh, Shippers Stevedoring's Barbour's Cut Terminal manager, testified that he was tracking the railcar sent to pick up the transformer on Shippers Stevedoring's online account with the Port Terminal Railroad. (Docket Entry No. 87, Ex. 10, Derlin Marsh Depo. at 75–78). A timeline produced by Shippers Stevedoring incorporates data from the Port Terminal Railroad account. The timeline shows a March 8 arrival date for the railcar. (Docket Entry No. 69, Ex. 1, Shippers Stevedoring Timeline). Crompton Greaves also notes that there were Shippers Stevedoring personnel at the yard on March 7 who could have moved the transformer. Scott Butler, Shippers Stevedoring's corporate representative, testified that in addition to Marsh, a walking foreman authorized to move the transformer to the rail siding was at the yard. (Docket Entry No. 87, Ex. 9, Scott Butler Depo. at 101–02).[3] Shippers Stevedoring denies that its employees moved the transformer on March 7.

The Union Pacific railcar did not arrive until March 12, 2007, the date the Shock-log recorded two more shocks. On that date, Shippers Stevedoring loaded the transformer onto the railcar using two cranes. Shippers Stevedoring alleges that its personnel drove the mafi about one-hundred feet to a rail line and loaded the transformer onto Union Pacific's railcar without incident. (Docket Entry No. 65, Ex. 6, Scott Butler Depo. at 55). Captain Rego, who also attended the March 12 loading, noted in his report that the transformer "was carefully loaded into position with no shocks." (*Id.*, Ex. 10, Vericlaim Report, at 6). On March 13, 2007, the transformer left on Union Pacific's railcar.

---

[3]   On March 8, 2007, Biehl & Co., agents for NSCSA, (Docket Entry No. 65, at 8), issued a "steamship release" to Shippers Stevedoring. Derlin Marsh, a Shippers Stevedoring employee, testified that the owner of cargo cannot take cargo out of port until a steamship release is issued. (*Id.*, Ex. 8, Derlin Marsh Depo. at 188–89).

Vision Logistics had hired Union Pacific to transport the transformer from the Port of Houston to Tucson.  On March 14, 2007, Vision Logistics and Union Pacific agreed to a bill of lading.  The bill of lading identified Vision Logistics as the shipper and Tucson Electric as the consignee.  (*Id.*, Ex. 1, Union Pacific Bill of Lading).  Vision Logistics entered the information about the transformer's transport on Union Pacific's computer to create the bill of lading.  (Docket Entry No. 99, Terry Sheldon Aff.).  Union Pacific has provided screen shots of the electronic form Vision Logistics used.  One box on the electronic form allows the shipper to select a tariff for the transport.  (*Id.*, Ex. 2).  The transformer was carried under UP Tariff 4467, which is governed by the Exempt Circular UP 16-series.  (*Id.*, Ex. 3, UP Tariff 4467).  The bill of lading, UP Tariff 4467, and Exempt Circular UP 16-series together formed the contract for carriage.

Item 16 of UP Exempt Circular 16 requires all claims against the carrier to be filed with the carrier within 9 months of the delivery date.  *See* 49 C.F.R. § 1005.2 ("a claim for . . . damage . . . to cargo shall not be voluntarily paid by a carrier unless filed . . . with [the carrier]" and allowing the time limit for such writing to be established in the bill of lading).  Item 124 from UP Exempt Circular 16 requires lawsuits based on the transport be filed within 18 months from the expected date of delivery.  (*Id.*, Ex. 9).  Finally, Item 3000 of UP Tariff 4467 caps liability for damage at $25,000.00 per car.  (*Id.*, Ex. 3).

Union Pacific transported the transformer to Arizona by rail.  On March 31, 2007, while the transformer was on Union Pacific's railcar, the Shock-log registered a fourth shock event.  On April 8, 2007, the transformer arrived in Arizona and was unloaded.  (Docket Entry No. 87, Ex. 8, Timeline).   Two days later, Gautam Mazumder, a Crompton Greaves supervising engineer, downloaded the Shock-log's data and turned it off.  (Docket Entry No. 76, Ex. 2, Sandeep

Chakravarty Depo. at 51).  The data showed four shock events, one on March 7, two on March 13, and one on March 31, 2007.  (*Id.*, Ex. 8, Mazumder Report; Docket Entry No. 87, Ex. 2, Sandeep Chakravarty Depo. at 215).

On April 19, 2007, the transformer was tested and did not work.  (Docket Entry No. 74, Ex. A, Sandeep Chakravarty Depo. at 67).  The next day, Crompton Greaves conducted its first internal inspection of the transformer in Arizona and found loose pieces of insulation at the bottom of the transformer tank, as well as other damage.  (Docket Entry No. 87, Ex. 2, Sandeep Chakravarty Depo. at 77).  Chakravarty testified that at first, Crompton Greaves, Tucson Power, and a consulting company hired by Tucson Power considered the damage to be minor and repairable.  (Docket Entry No. 87, Ex. 2, Sandeep Chakravarty Depo. at 108).  Crompton Greaves shipped the transformer to the Edison ESI facility in Westminister, California for repair.  (*Id.*, 222).  Edison inspected the transformer and informed Crompton Greaves that it would have to be rebuilt.  Chakravarty testified that at this point, Crompton Greaves had incurred approximately $750,000.00 in expenses and that Pauwels America had paid most of those.  (*Id.*, 145); (Docket Entry No. 74, Ex. A, Sandeep Chakravarty Depo. at 141–42).

Because Edison did not have the capability to rebuild the transformer, Crompton Greaves and Tucson Power decided to ship it to a plant in Canada for rebuilding.  (Docket Entry No. 74, Ex. A, Sandeep Chakravarty Depo. at 219–20).  The transformer was rebuilt and shipped back to Tucson.  (*Id.*, 49).  In total, Crompton Greaves alleges that it incurred $2,749,858.76 in damages.  Captain Rego testified that the commercial value of the transformer at the time it was damaged was its invoice price, $1,264,135.00.

10

On March 19, 2009, Crompton Greaves filed this suit against Shippers Stevedoring.  Its complaint asserted claims for negligence, including under *res ipsa loquitur*; breach of contract; and breach of bailment obligations.[4]  On February 24, 2010, Shippers Stevedoring filed a third-party complaint against Union Pacific for indemnity or contribution.  (Docket Entry No. 61).

Shippers Stevedoring has filed two motions for summary judgment.  The first argues that Shippers Stevedoring is entitled to the liability limitations under the Himalaya Clause in NSCSA's bill of lading because the cargo was not delivered until March 8, 2007, when the steamship release issued, or until March 13, 2007, when the transformer left the Port of Houston.  (Docket Entry No. 65).  The motion also argues that under COGSA, Crompton Greaves's claims are barred by the statute of limitations or limited to $500.00.  Crompton Greaves responded, (Docket Entry No. 69), and Shippers Stevedoring replied, (Docket Entry No. 70).  Shippers Stevedoring also moved to strike evidence Crompton Greaves attached to its response, (Docket Entry No. 71).  Crompton Greaves responded, (Docket Entry No. 80), and Shippers Stevedoring replied, (Docket Entry No. 82).

In its second motion for summary judgment, Shippers Stevedoring argues that it is not liable to Crompton Greaves for negligence or breach of contract.  (Docket Entry No. 74).  Alternatively, Shippers Stevedoring argues that the constructive-loss doctrine limits Crompton Greaves's damages. Crompton Greaves responded, (Docket Entry No. 87); Shippers Stevedoring replied, (Docket Entry No. 95); Crompton Greaves surreplied, (Docket Entry No. 106); and Shippers Stevedoring responded to the surreply, (Docket Entry No. 111).

---

[4]   An amended complaint asserted claims against Alomex, Vision Logistics, and Time Marine.  (Docket Entry No. 19).  These parties have since been dismissed from the lawsuit.

11

Shippers Stevedoring has also moved for an adverse inference instruction against Crompton Greaves based on evidence that there was a second shock recorder but neither it nor data from it has been produced. (Docket Entry No. 77). Shippers Stevedoring argues that because Crompton Greaves has not produced data from the second shock recorder, an adverse inference that the data from the second shock recorder would have shown that there were no shocks is appropriate. Crompton Greaves responded, (Docket Entry No. 82), and Shippers Stevedoring replied, (Docket Entry No. 84).

Crompton Greaves has also moved for partial summary judgment on liability. It argues that Shippers Stevedoring had an implied contract for bailment of the transformer on March 7 and March 13, 2007, creating a presumption of negligence that Shippers Stevedoring has not rebutted. (Docket Entry No. 76). Shippers Stevedoring responded, (Docket Entry No. 84).

Union Pacific and Crompton Greaves have also moved to sever Shippers Stevedoring's claims against Union Pacific on the basis that it has not had an opportunity to conduct discovery and that Shippers Stevedoring joined Union Pacific too late. (Docket Entries No. 75, 90). Shippers Stevedoring responded. (Docket Entry No. 83). Union Pacific has also moved for summary judgment that Shippers Stevedoring lacks standing because it was not a party to the bill of lading. Alternatively, Union Pacific argues that the bill of lading bars Shippers Stevedoring's claims or limits liability to $25,000.00. (Docket Entry No. 99). Shippers Stevedoring responded, (Docket Entry No. 104), and Union Pacific supplemented, (Docket Entry No. 107).

Each motion is analyzed below.

## II.    The Motion to Strike

Shippers Stevedoring moved to strike Exhibits 2, 4, 8, attached to Crompton Greaves's response to Shippers Stevedoring's motion for partial summary judgment. (Docket Entry No. 69). This court did not consider Exhibits 2 and 8, making the motion to strike those exhibits moot.[5] Exhibit 4 contains emails between Crompton Greaves and Alomex about the transformer's shipment. Shippers Stevedoring moved to strike on the basis that these emails "are not relevant to this court's determination of 'delivery' and the contents of the emails are hearsay." (Docket Entry No. 71, at 2).

The emails between Crompton Greaves and Alomex are properly considered on summary judgment. Sandeep Chakravarty, Crompton Greaves's regional vice-president of sales to Latin America and the Caribbean, testified that the February 8, 2007 email was the invoice from Alomex for inland transport and established the terms and conditions of the transport. (Docket Entry No. 80, Ex. A, Sandeep Chakravarty Depo. at 170–71). Crompton Greaves's agreement with Alomex is relevant. Crompton Greaves argues that because Shippers Stevedoring operated under this agreement as Alomex's agent it cannot claim defenses and liability limitations under NSCSA's bill of lading. A contract is not hearsay because it has independent legal significance. *See Kepner-Tregoe, Inc. v. Leadership Software, Inc.*, 12 F.3d 527, 540 (5th Cir. 1994) ("Signed instruments such as wills, contracts, and promissory notes are writings that have independent legal significance and are not hearsay."); *Everest Indem. Ins. Co. v. Allied Int'l Emergency LLC*, Civ. No. 4:08-CV-678-Y, 2009 WL 2030421, at *2 (N.D. Tex. July 14, 2009) ("A contract is not hearsay."). Because a contract is not hearsay, to be admissible it need only be authenticated. *Everest Indem.*, 2009 WL

---

[5]   Exhibit 2 is an email from NSCSA discussing the terms of its bill of lading. Exhibit 8 is a two-page printout entitled "ShipperConnect Port Terminal Railroad Association."

2030421, at *2.  "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims."  FED. R. EV. 901(a).  "The standard for authenticating evidence is low and may be satisfied 'by evidence sufficient to support a finding that the matter in question is what its proponent claims.'"  *United States v. Carroll*, No. Crim. A. 99-88, 2000 WL 45870, at *3 (E.D. La. Jan. 20, 2000) (quoting *United States v. Arce*, 997 F.2d 1123, 1128 (5th Cir. 1993)); *see also United States v. Jackson*, 625 F.3d 875, 881 (5th Cir. 2010) ("[The Fifth Circuit does not require conclusive proof of authenticity before allowing the admission of disputed evidence. . . . [Rule 901] merely requires some evidence which is sufficient to support a finding that the evidence in question is what its proponent claims it to be.").

Shippers Stevedoring's motion to strike is denied.

## III.    The Summary Judgment Motions

### A.    The Legal Standard

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c).  "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact."  *Triple Tee Golf*, *Inc. v. Nike*, *Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)).

If the burden of proof at trial lies with the nonmoving party, the movant may satisfy its initial burden by "'showing' — that is, pointing out to the district court — that there is an absence of evidence to support the nonmoving party's case."  *See Celotex*, 477 U.S. at 325.  While the party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, it

14

does not need to negate the elements of the nonmovant's case. *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005) (citation omitted). "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009) (quotation omitted). "If the moving party fails to meet [its] initial burden, the motion [for summary judgment] must be denied, regardless of the nonmovant's response." *United States v. $92,203.00 in U.S. Currency*, 537 F.3d 504, 507 (5th Cir. 2008) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)).

When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings. The nonmovant must identify specific evidence in the record and articulate how that evidence supports that party's claim. *Baranowski v. Hart*, 486 F.3d 112, 119 (5th Cir. 2007). "This burden will not be satisfied by 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'" *Boudreaux*, 402 F.3d at 540 (quoting *Little*, 37 F.3d at 1075). In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *Connors v. Graves*, 538 F.3d 373, 376 (5th Cir. 2008).

### B.    Shippers Stevedoring's Motion for Summary Judgment under COGSA

Shippers Stevedoring argues that it is entitled to judgment that COGSA defenses and liability limitations in the Himalaya Clause in NSCSA's bill of lading apply. Crompton Greaves responds that under the Himalaya Clause, these defenses and liability limitations are only available to agents or subcontractors of NSCSA. Crompton Greaves argues that the evidence shows that Shippers Stevedoring was Alomex's agent or subcontractor. Shippers Stevedoring responds that because the alleged damage occurred before "delivery" under the bill of lading, it can assert the bill of lading's

15

defenses and liability limitations, regardless of whether it was NSCSA's agent or subcontractor. Shippers Stevedoring also responds that the contention Alomex hired and instructed Shippers Stevedoring is refuted by evidence that Vision Logistics gave Shippers Stevedoring instructions.

COGSA governs bills of lading "from the time when the goods are loaded on to the time when they are discharged from the ship."  COGSA § 1(e), 49 Stat. 1207 (1936), *reprinted in* note following 46 U.S.C. § 30701; *Kirby*, 543 U.S. at 29, 125 S. Ct. 385.  During this "tackle to tackle" period, as a default rule, the carrier's liability is limited to $500.00 per package, "or in the case of goods not shipped in packages, per customary freight unit," unless a higher value has been "declared by the shipper before shipment and inserted in the bill of lading," or the carrier and shipper have agreed to a higher limit by contract.  COGSA § 5, 49 Stat. 1207 (1936), *reprinted in* note following 46 U.S.C. § 30701.  Under COGSA, contracting parties may extend the period during which the liability limit applies to include "the custody and care and handling of goods prior to the loading on and subsequent to the discharge from the ship."  *Id.*, § 7, *reprinted in* note following 46 U.S.C. § 30701 ("Nothing contained in this chapter [this note] shall prevent a carrier or a shipper from entering into any agreement, stipulation, condition, reservation, or exemption as to the responsibility and liability of the carrier or the ship for the loss or damage to or in connection with the custody and care and handling of goods prior to the loading on and subsequent to the discharge from the ship on which the goods are carried by sea." (alterations added by Pub. L. 109-304, Oct. 6, 2006, 120 Stat. 1485)).

Crompton Greaves argues that Shippers Stevedoring is not entitled to take advantage of the otherwise enforceable limitations on liability in the bill of lading.  The Himalaya Clause, section 4(c) of the bill of lading, limits the liability of "the ship managers, operator, insurer, servant,

16

independent contractor, or subcontractor *of the carrier or underlying carrier*, including terminal operators, stevedores, carpenters, and watchmen."  (Docket Entry No. 69, Ex. 2, Bill of Lading (emphasis added)).  A Himalaya Clause is interpreted like any other contract term.  *Kirby*, 543 U.S. at 31, 125 S. Ct. 385.  This Himalaya Clause is clear and unambiguous and is interpreted based on its plain meaning.  *See id.* at 31–32; *Henley v. Edlemon*, 297 F.3d 427, 430 & n.5 (5th Cir. 2002) (describing federal law of contract interpretation).

Under the plain meaning of this Himalaya Clause, COGSA defenses and liability limitations are available only if Shippers Stevedoring can show that it was a manager, operator, insurer, servant, independent contractor, or subcontractor of NSCSA.  *See Dewanchand Ramsaran Indus. Ltd. v. Ports Am. Tex., Inc.*, Civ. A. No. H-08-1274, 2010 WL 707380, at *6–7 (S.D. Tex. Feb. 24, 2010). Shippers Stevedoring does not argue, or produce or identify summary-judgment evidence, that it was NSCSA's subcontractor.  Crompton Greaves has submitted an email in which Alomex — who Crompton Greaves claims was responsible for the inland transport — instructed Shippers Stevedoring to coordinate the transfer of the transformer from the *M/V Saudi Diriyah* to a railcar for inland shipment.[6]  (Docket Entry No. 69, Ex. 5).  Shippers Stevedoring argues that evidence submitted by Crompton Greaves shows that Vision Logistics also provided instructions to Shippers Stevedoring.  But this evidence does not show that Shippers Stevedoring acted as NSCSA's subcontractor.

---

[6]   Shippers Stevedoring also acknowledges that Alomex paid it to place the transformer onto the railcar. (Docket Entry No. 74, at 4).

Shippers Stevedoring is not entitled to summary judgment on the basis that COGSA's one-year statute of limitations bars Crompton Greaves's claims or that COGSA limits Shippers Stevedoring's damages to $500.00.  The motion for summary judgment on these grounds is denied.[7]

### C.    Shippers Stevedoring's Motion for Summary Judgment on all Claims

In its second motion for summary judgment, Shippers Stevedoring argues that it is entitled to judgment that it is not liable to Crompton Greaves for negligence or breach of contract.  (Docket Entry No. 74).  Alternatively, Shippers Stevedoring argues that the constructive-loss doctrine limits Crompton Greaves's damages.

### 1.    Negligence

Shippers Stevedoring argues that it is entitled to summary judgment on Crompton Greaves's negligence claim because there is no evidence of causation.  Shippers Stevedoring argues that the March 7 shock recording provides only "speculative" evidence that Shippers Stevedoring's negligence caused damage to the transformer.  Crompton Greaves responds that the March 7 Shock-log recording and expert testimony that the Shock-log was properly functioning creates a fact issue as to Shippers Stevedoring's negligence.[8]

In Texas, the elements of negligence are that: (1) the defendant owed the plaintiff a duty of care; (2) the defendant breached the duty; and (3) the defendant's breach proximately caused injury to the plaintiff.  *IHS Cedars Treatment Ctr. v. Mason*, 143 S.W.3d 794, 798 (Tex. 2003).  Shippers

---

[7]   Shippers Stevedoring also argues that Crompton Greaves's position is inconsistent with its bailment argument.  Because Crompton Greaves's motion for liability based on bailment is denied without deciding whether a bailment existed, it is not necessary to reach this argument.

[8]   Because this court finds that Crompton Greaves has demonstrated a fact issue as to whether Shippers Stevedoring's negligence damaged to transformer on March 7, 2007, it does not consider whether Shippers Stevedoring's negligence also damaged the transformer on other dates.

Stevedoring argues only that Crompton Greaves has not produced sufficient evidence that Shippers Stevedoring proximately caused the injury. A plaintiff can prove causation by direct or circumstantial evidence. *Alza Corp. v. Thompson*, No. 13-07-00090-CV, 2010 WL 1254610, at *8 (Tex. App.—Corpus Christi Apr. 1, 2010, no pet.) (citing *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004)). "The question of causation is a fact question for the jury, and the jury has broad latitude to infer causation from the circumstances surrounding an accident, especially when it is not possible to produce direct proof of causation." *Id.* (citing *Farley v. MM Cattle Co.*, 529 S.W.2d 751, 755 (Tex. 1975)). "The plaintiff need not exclude all possibility that the accident occurred other than as he alleges. Rather the plaintiff is only required to convince the jury by a preponderance of the evidence that the accident occurred as alleged." *Id.* (citing *Farley*, 529 S.W.2d at 756; *Renfro Drug Co. v. Lewis*, 235 S.W.2d 609, 621 (Tex. 1950)). But "[t]o raise a genuine issue of material fact . . . the evidence must transcend mere suspicion. Evidence that is so slight as to make any inference a guess is in legal effect no evidence." *Ridgway*, 135 S.W.3d at 601.

Crompton Greaves has produced sufficient circumstantial evidence to create a fact issue as to whether Shippers Stevedoring caused the damage to the transformer. Shippers Stevedoring has admitted that the transformer was in its custody on March 7, 2007, when the Shock-log registered the first shock. In response to a request for admission, Shippers Stevedoring admitted that it "discharged, that is unloaded the goods in question, at the Port of Houston on or about March 1, 2007," and that the "cargo in question was in [Shippers Stevedoring's] custody from March 2, 2007 through March 11, 2007." (Docket Entry No. 76, Ex. 7).[9] Crompton Greaves has also produced

---

[9]   In response to Crompton Greaves's motion for summary judgment on liability, Shippers Stevedoring argues that there was no implied contract for bailment of the transformer because delivery of the transformer was incomplete until it was released by NSCSA and customs. To the extent Shippers Stevedoring argues that its delivery argument responds to Crompton Greaves's negligence claim, the

circumstantial evidence raising a fact issue as to whether Shippers Stevedoring dropped the transformer in a failed attempt to move it for railroad transport. Crompton Greaves's expert, Dr. David Hullender, testified that only "something . . . big," such as a drop, could have created the force registered on the Shock-log. (Docket Entry No. 87, Ex. 6, Dr. David Hullender Depo. at 27). Dr. Hullender further testified that based on the registered force, "in all probability, it did get dropped." (*Id.*, 27–28). A timeline produced by Shippers Stevedoring shows that it expected the railcar to arrive on March 8. (*Id.*, Ex. 8, timeline; Ex. 10, Derlin Marsh Depo. at 76). Another Crompton Greaves expert, Edmund Feloni, testified that based on the railcar's expected arrival date, "it would make sense that [Shippers Stevedoring was] preparing to move it." (*Id.*, Ex. 8, Edmund Feloni Depo. at 174). There were Shippers Stevedoring personnel at the yard on March 7 authorized to move the transformer. Scott Butler, Shippers Stevedoring's corporate representative, testified that on March 7, Shippers Stevedoring's walking foreman was at the yard and authorized to move the transformer to the rail siding. (*Id.*, Ex. 9, Scott Butler Depo. at 101–02).

Shippers Stevedoring argues that testimony from Captain Rego, Pauwels's marine surveyor, that he inspected the transformer on March 7 and did not see anyone working around it establishes that Shippers Stevedoring did not attempt to move the transformer on that date. Dale Schabel, a representative from Pauwels was also present for the inspection. The first shock event was recorded at 23:51 hours 13 seconds, a little past noon. (Docket Entry No. 87, Ex. 2, Sandeep Chakravarty Depo. at 214–15). The evidence, however, is that Rego and Schabel inspected the transformer "in the morning hours." (*Id.*, 215). Shippers Stevedoring points out that Captain Rego took a

---

argument does not provide a basis to Shippers Stevedoring's motion for summary judgment. Shippers Stevedoring admitted that it had custody of the transformer on March 7, 2007. It may be liable for its negligence even if it did not have an implied contract for bailment of the transformer.

photograph of a transformer at 12:41 p.m.  (Docket Entry No. 95, Ex. 3, Forensic Expert Report, at 2).  But there is evidence that this photograph was not of the transformer at issue.  Rego and Schabel also inspected cargo stored in "a distant Shippers warehouse which blocked [any] view of the location of the transformer," and the 12:41 photograph shows this cargo.  (Docket Entry No. 106, Ex. 4, Captain Rego. Depo. at 164–65).  Captain Rego's first photograph of the transformer was taken at 1:28 p.m., approximately an hour and ten minutes after the shock event's time.  Captain Rego's testimony and photographs do not show that, as a matter of law, Shippers Stevedoring did not damage the transformer.

Shippers Stevedoring argues that Crompton Greaves's evidence is insufficient under the Texas Supreme Court's decision in *Marathon Corporation v. Pitzner*, 106 S.W.3d 724 (2003).  In *Marathon*, an air conditioning repairman sued a motorcycle dealership after he fell from the roof of a building the dealership rented.  *Id.* at 725–26.  The repairman did not recall the accident.  He relied on evidence that the premises did not comply with building and mechanical codes and expert testimony to prove negligence.  The dealership violated the codes because the air conditioning units did not have a 30-inch workspace in front of their access panels and because the units did not have a power disconnect on the roof so that all electrical power to the units could be shut off by someone working on the roof.  *Id.* at 727–28.  One expert testified that, based on testimony from the repairman who completed the repairs after the accident, the plaintiff "had almost finished repairing a freon leak."  *Id.* at 728.  The expert testified that after repairing a freon leak, repairmen  usually restart the air conditioning unit by connecting two low-voltage lines.  The expert speculated that if the air conditioning unit had been turned off downstairs — which was possible because the building was not in code compliance — the plaintiff would have reached inside the air conditioning units

access panel to push a black bar that could bypass the control circuit and start the unit.  The expert testified that "[a]lthough it was common for repairmen to do this . . . it could result in an electrical shock or flash."  *Id.*  There was, however, no evidence that the air conditioning unit had been turned off downstairs.  A second expert testified that "the lack of space between the units caused [the plaintiff] to reach into the access panel at an angle that made it more likely that he would come into contact with a high-voltage wire."  *Id.* at 728–29.  The court, noting that the experts' testimony piled "speculation on speculation and inference on inference," reversed the jury verdict in favor of the plaintiff because "the circumstances 'could give rise to any number of inferences, none more probable than the other.'"  *Id.* at 729 (citing *Hammerly Oaks, Inc. v. Edwards*, 958 S.W.2d 387, 392 (Tex. 1997)).  For example, the court reasoned, because the plaintiff's injuries were also consistent with an assault and battery and because there was no ladder at the scene — supporting an inference that someone else was present at some point — it was equally plausible that the plaintiff was attacked.  *Id.*  The court concluded that "'in cases with only slight circumstantial evidence, something else must be found in the record to corroborate the probability of the fact's existence or non-existence.'"  *Id.* (quoting *Hammerly Oaks*, 958 S.W.2d at 392).

*Marathon* is distinguishable.  The *Marathon* plaintiff presented competing liability theories and there was another theory that was equally plausible but did not involve negligence by the defendant. The court found that there was insufficient evidence to sustain the jury's verdict. Crompton Greaves has presented evidence supporting only one theory: that Shippers Stevedoring damaged the transformer by dropping it while trying to load it onto the rail line on March 7, 2007. The shock recording is circumstantial evidence that the transformer was dropped on that date.  The expected March 8 arrival of the railcar provides circumstantial evidence that Shippers Stevedoring

attempted to move the transformer on March 7.  This evidence provides the "something else" corroborating the probability that Shippers Stevedoring moved the transformer on March 7.  This evidence creates a fact issue as to negligence.[10]

### 2. Breach of Contract and Bailment

Shippers Stevedoring argues that it did not have an express contract with Crompton Greaves and that as a matter of law the evidence is insufficient to establish an implied contract for bailment. Shippers Stevedoring emphasizes that the evidence shows that it did not have control over the transformer on March 7 because it was not authorized to move the transformer until it received a "steamship release," which did not occur until March 8.  Shippers Stevedoring also emphasizes that under NSCSA's bill of lading, it did not have control of the transformer on March 7 because "delivery" did not occur until the transformer was given a steamship release or until it was delivered to Union Pacific for transport.  Crompton Greaves responds that in a request for admission, Shippers Stevedoring admitted that it had custody of the transformer on March 7, 2007, the date of the first shock, and that this admission shows an implied bailment.

A bailment relationship does not create a specific cause of action but instead allows the bailor to choose the form of relief for breach, such as an action for breach of contract or an action for conversion.  *See Int'l Freight Forwarding*, *Inc. v. Am. Flange*, 993 S.W.2d 262, 269 (Tex. App.—San Antonio 1999, no pet.); *see also Prime Products, Inc. v. SSI Plastics, Inc.*, 97 S.W.3d 631, 638 (Tex. App.—Houston [1st Dist.] 2002, pet. denied) (a bailment claim is not a separate

---

[10]   Shippers Stevedoring also cites *Hammerly Oaks, Inc. v. Edwards*, 958 S.W.2d 387 (Tex. 1997); *Doe v. Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d 472 (Tex. 1995); *Havner v. E-Z Mart Stores, Inc.*, 825 S.W.2d 456 (Tex. 1992); and *Loeser v. Sans One, Inc.*, 187 S.W.3d 685 (Tex. App.—Houston [14th Dist.] 2006, pet. denied) for its argument that a plaintiff must produce sufficient evidence to demonstrate a more-than-speculative inference of causation.  For the reasons discussed here, Crompton Greaves has produced sufficient evidence.

cause of action from a breach of contract claim).  A bailment relationship generally requires: (1) a contract, either express or implied; (2) delivery of property to the bailee; and (3) acceptance of the property by the bailee.  *Russell v. Am. Real Estate Corp.*, 89 S.W.3d 204, 210 (Tex. App.—Corpus Christi 2002, no pet.); *see also Smith v. Radam, Inc.*, 51 S.W.3d 413, 417 (Tex. App.—Houston [1 Dist.] 2001, no pet.) (a bailment relationship results from a contract under which bailed goods are delivered by the bailor and accepted by the bailee for a specific purpose).  An implied bailor–bailee relationship may give rise to an implied bailment contract.  *Smith*, 51 S.W.3d at 417.  In an implied bailment, it is not necessary that delivery and acceptance be formal.  *Russell*, 89 S.W.3d at 211.  Knowingly taking property into possession or control may establish an implied bailment.  *Id.*  The creation of a bailment requires that possession and control over an object pass from the bailor to the bailee.  *Allright Auto Parks*, *Inc. v. Moore*, 560 S.W.2d 129, 130 (Tex. Civ. App.—San Antonio 1977, writ ref'd n.r.e.).

Crompton Greaves has submitted sufficient circumstantial evidence to support an implied bailment.  Shippers Stevedoring knowingly accepted the transformer when it was discharged from the *M/V Saudi Diriyah* on March 1, 2007 and that the transformer was in Shippers Stevedoring's custody when the first shock event was recorded.  *Russell*, 89 S.W.3d at 211 ("In general, knowingly taking property into possession or control is a sufficient acceptance and may suffice to establish an implied bailment."); *see also Berlow v. Sheraton Dallas*, 629 S.W.2d 818, (Tex. App.—Dallas 1982) (finding evidence that a hotel accepted delivery of a package intended for a guest and stored it for one month sufficiently supported the jury's finding of an implied bailment).  In response to a request for admission, Shippers Stevedoring admitted that it "discharged, that is unloaded the goods in question, at the Port of Houston on or about March 1, 2007," and that the "cargo in question was in

24

[Shippers Stevedoring's] custody from March 2, 2007 through March 11, 2007." (Docket Entry No. 76, Ex. 7).  There is also record evidence that Shippers Stevedoring knew it was unloading cargo belonging to Crompton Greaves.  *Compare Hoye v. Like*, 958 S.W.2d 234, 237 (Tex. App.—Amarillo 1997, no pet.) (finding that bailment over cattle did not exist where there was no evidence that the caretaker of cattle knew the cattle's owner).  Crompton Greaves hired Alomex to handle the inland portion of the transformer's transport.  Alomex sent Shippers Stevedoring an email instructing it to receive the cargo and to coordinate its transfer to a railcar.  (Docket Entry No. 76, Ex. 5).  Attached to the email was a packing list identifying Crompton Greaves as the "exporter/manufacturer/producer" of the transformer.  (Docket Entry No. 72, Ex. 3, Packing List, at p. 16).  This evidence supports a finding that a bailment existed.

Shippers Stevedoring argues that no bailment existed because it was not in privity with Crompton Greaves and had only contracted with Alomex.  Shippers Stevedoring also points to testimony by Chakravarty that "the custody of or the responsibility of Alomex began on the date and the time the goods were offloaded from the ship" and that Alomex had "custody and control" over the transformer while it was at the Port of Houston.[11]  (Docket Entry No. 95, Ex. 1, Sandeep

---

[11]   Chakravarty is Crompton Greaves's corporate representative.  His testimony does not bind Crompton Greaves, but does provide evidence either party may use.  A Rule 30(b)(6) deposition is admissible against the party designating the representative but is not "binding" on the entity for which the witness testifies in the sense of preclusion or judicial admission.  CHARLES A. WRIGHT *ET AL.*, FEDERAL PRACTICE & PROCEDURE § 2103 (2d ed. 1994).  Rule 30(b)(6) does not bind an entity to its designee's recollection unless it shows that contrary information was not known or unavailable.  Testimony given in a Rule 30(b)(6) deposition is evidence, which, like other deposition testimony, can be contradicted and used for impeachment purposes.  *See A.I. Credit Corp. v. Legion Ins. Co.*, 265 F.3d 630, 637 (7th Cir. 2001); *see also Diamond Triumph Auto Glass*, *Inc. v. Safelite Glass*, 441 F.Supp.2d 695, 723 n.17 (M.D. Pa. 2006) (rejecting the plaintiff's argument that the court should limit the defendant to the testimony of its corporate representative simply because "the witness could not answer the questions"; the plaintiff never filed a motion to compel or a motion for sanctions and "[t]he Federal Rules of Civil Procedure do not allow such a severe sanction under these circumstances").

Chakravarty Depo. at 187, 192).  Shippers Stevedoring argues that under this court's decision in *Suzlon Wind Energy Corp. v. Shippers Stevedoring Co.*, 662 F. Supp. 2d 623 (S.D. Tex. 2009), privity is required for a bailment.

In *Suzlon*, Suzlon Wind Energy sued Shippers Stevedoring after fire damaged a nacelle (part of a wind turbine generator) while Shippers Stevedoring was performing "hot work." *Id.* at 633. Suzlon filed a cross-claim against Andrews Boom Repair, Inc. ("ABR"), a third-party defendant, which had performed welding work for Shippers Stevedoring.  Suzlon argued that there was an implied bailment between it and ABR, created when ABR accepted delivery of the nacelle and began working on it. *Id.* at 655.  ABR responded that the nacelle was never in its custody or control and that it could not have formed an implied bailment with Suzlon because ABR was not even aware that Suzlon existed. *Id.* at 655–56.  This court found that no bailment existed because there was no evidence that ABR knew it was assuming the responsibilities of bailee or that ABR knew it was taking possession, custody, or control of the nacelle by performing hot work, and there was no evidence that ABR knew of Suzlon's existence. *Id.* at 656.  The issue in *Suzlon* was not whether ABR was in privity with Suzlon.  Instead, the issue was whether there was sufficient circumstantial evidence to find that ABR had accepted property it knew belonged to Suzlon or that ABR had custody, control, or possession of the property when it performed welding work.  There was no evidence showing that when ABR began welding, it understood that it was also assuming custody, control, or possession of Suzlon's nacelle.  To the contrary, the evidence showed that ABR was only hired to perform welding work.  There was also no evidence that ABR knew that the nacelle belonged to Suzlon.

The facts of the present case are different.  Crompton Greaves has submitted evidence that Shippers Stevedoring knew that the transformer belonged to Crompton Greaves; that Shippers Stevedoring knowingly accepted the property from the *M/V Saudi Diriyah*; and that Shippers Stevedoring had custody of the transformer from its discharge until its placement on the railcar.

Shippers Stevedoring also argues that it did not have control of the transformer on March 7 because NSCSA did not issue the steamship release until March 8.  But even assuming that Shippers Stevedoring lacked authorization to move the transformer before March 8, this does not demonstrate the absence of an implied bailment.  Under Texas law, custody of the bailor's property is sufficient to support an implied contract for bailment.  *See Russell*, 89 S.W.3d at 210 ("In general, knowingly taking property into possession *or* control is a sufficient acceptance and may suffice to establish an implied bailment.").  The decision in *Soto v. Sea-Road Int'l, Inc.*, 942 S.W.2d 67 (Tex. App.—Corpus Christi, no pet.), is instructive.  In *Soto*, a South Korean textile company hired the plaintiff, Sea-Road International, to handle the inland transportation of a fabric order placed by the Textile Corporation.  Sea-Road received the fabric and, at Textile's request, forwarded the shipment to the defendant, Luciana Soto, who had a warehouse in Brownsville, Texas.  Sea-Road ordered Soto to "check with Sea Road Int'l before releasing any merchandise."  *Id.* at 69.  The goods were damaged in Soto's warehouse.  On appeal, Soto argued that because he did not have formal contact with Sea-Road, no bailment relationship was created.  The appellate court rejected his argument. It found that Soto's acceptance of the goods with specific instructions for its release, combined with expert testimony that such instructions are understood in the industry as obligatory, provided sufficient evidence of a bailment.  *Id.* at 72.  Because of this, "formal communication . . . was not necessary."  *Id.*  In the present case, there is similar evidence.  Shippers Stevedoring accepted

27

custody of the transformer with specific instructions to hold it until a railcar arrived and to load the transformer onto the railcar.  That Shippers Stevedoring lacked authority to move the transformer to the railcar until NSCSA released it does not provide a basis for summary judgment.[12]

### 3.    Damages

Shippers Stevedoring seeks summary judgment that the doctrine of constructive total loss, which limits recovery for damage to goods to their fair market value before damage.  Applied here, the doctrine limits Crompton Greaves's damages to the fair market value of the transformer on the date it was damaged ($1,264,135.00) less the amount Crompton Greaves recovered by selling salvage materials from the transformer ($198,000.00).  Shipper Stevedoring also argues that Crompton Greaves does not have standing to recover the $748,428.76 incurred for shipping the transformer to Edison because Pauwels America paid these expenses.

Crompton Greaves responds that it may recover the costs it incurred in good faith to mitigate its damages, even if the cost of repairs exceeded the transformer's value before the damage. Crompton Greaves also argues that even though Pauwels America paid for the shipment to Edison, Crompton Greaves ultimately incurred those damages because it bore the risk of loss and because it is Pauwels America's parent company.

### a.    Constructive total loss

"'The purpose of compensatory damages . . . is to place the injured person as nearly as possible in the condition he would have occupied if the wrong had not occurred." *Transcon. Gas Pipe Line Corp. v. Societe D'Exploitation du Solitaire*, 299 F. App'x 347, 350 (5th Cir. Nov. 10,

---

[12]   Because there are fact issues as to the breach of contract claim, Shippers Stevedoring's motion for summary judgment on attorneys' fees is also denied.

2008) (quoting *Pizani v. M/V Cotton Blossom*, 669 F.2d 1084, 1088 (5th Cir. 1982)).  "Market value is the primary method of valuation in cases involving damages to personal property."  *Braden v. Kirkland*, No. 09-04-077 CV, 2004 WL 2365176, at *2 (Tex. App.—Beaumont Oct. 21, 2004, no pet.).  "If the property has a market value, a plaintiff's damages are measurable as the difference in market value immediately before and after the injury."  *Id.* (citing *Pasadena State Bank v. Isaac*, 228 S.W.2d 127, 128 (Tex. 1950)).  "If the property has no market value and can be replaced, replacement costs are the proper measure of damages."  *Id.*  But "different factual situations may require the application of a different measure of damages."  *Samuel v. KTVU P'ship*, No 02-00010-CV, 08-2003 WL 22405384, at *1 (Tex. App.—El Paso Oct. 22, 2003, pet. denied).  And "[a] plaintiff may elect repair damages instead of valuation damages."  *Id.* (citing *Central Freight Lines, Inc. v. Naztec, Inc.*, 790 S.W.2d 733, 734 (Tex. App.—El Paso 1990, no writ)).  "A plaintiff must prove the costs of repair were reasonable and necessary."  *Id.* (citing *2 Fat Guys Inv., Inc. v. Klayer*, 928 S.W.2d 268, 273 (Tex. App.—San Antonio 1996, no writ)).

In both contract and tort cases, a plaintiff has a duty to mitigate damages.  *Formosa Plastics Corp., USA v. Kajima Intn'l, Inc.*, 216 S.W.3d 436, 459 (Tex. App.—Corpus Christi 2006, pet. denied).  "The concept of mitigation requires the plaintiff to exercise reasonable care in minimizing its damages."  *Id.* (citing *Great Am. Ins. Co. v. N. Austin MUD*, 908 S.W.2d 415, 426 (Tex. 1995)).  The duty raises only if "'it can be done with 'trifling expense or with reasonable exertions.'"  *Id.* (quoting *Gunn Infiniti v. O'Byrne*, 996 S.W.2d 854, 857 (Tex. 1999)).  The defendant has the burden to show that the plaintiff did not use ordinary care in reducing or avoiding its damages.  *Id.* (citing *Moulton v. Alamo Ambulance Serv.*, 414 S.W.2d 44, 450 (Tex. 1967)).

A fact issue exists as to the market value of the transformer when it was allegedly damaged. Shippers Stevedoring argues that the market value as of March 2007 was $1,264,135.00. Shippers Stevedoring bases the market value on the Crompton Greaves's January 25, 2007 invoice for the sale of the transformer. The invoice shows that Tucson Power ordered the transformer on August 31, 2006. The record does not show whether the price was negotiated when the transformer was ordered or at a later date. There is evidence, however, that beginning in 2006, the transformer's market value continuously increased. Crompton Greaves's expert, Edmund Feloni, testified that the cost of producing transformers increased beginning in 2006 through 2007. He testified that "in some cases," the costs "almost doubled or tripled," due in part to price increases for commodities such as copper. (Docket Entry No. 87, Ex. 7, Edmund Feloni Depo. at 145–46). Feloni's testimony creates a fact issue as to whether Crompton Greaves's damages are limited to the invoice price. Shippers Stevedoring is not entitled to summary judgment that Crompton Greaves's damages are limited to $1,264,135.00 less the amount it obtained through salvage.

Shippers Stevedoring has only moved for summary judgment that Crompton Greaves's damages are limited to $1,264,135.00 less the amount it obtained through salvage. In their briefing, the parties vigorously dispute whether Crompton Greaves may recover both the $748,428.76 for initial repair costs and the additional $2,749,858.76 for rebuilding the transformer in Canada. Neither party has produced cases discussing whether, under Texas law, damages in excess of the market value can be recovered. Crompton Greaves cites the Seventh Circuit's decision in *Toledo Peoria and Western Ry. v. Metro Waste Sys., Inc.*, 59 F.3d 637 (7th Cir. 1995). In *Toledo*, Toledo Peoria and Western Railway ("Toledo Railway") sued Metro Waste Systems for negligence. A Metro Waste Systems dump truck struck four Toledo Railway locomotives while crossing railroad

30

tracks in disregard of warning signs.  *Id.* at 638.  Toledo Railway shipped the four locomotives to

Texas for repair.  Three were repaired for less than the replacement cost.  Before repairs on the

fourth locomotive were completed, the repair shop went into bankruptcy.  *Id.* at 638–39.  Toledo

Railway paid the bankruptcy trustee $74,000.00, the total cost of the partial repairs performed, to

retrieve the fourth locomotive.  Toledo Railway received a $40,000.00 estimate for completing the

repairs.  Because Toledo Railway had already invested $74,000.00 which, with the additional

$40,000.00, was still less than the replacement cost *at the time of the accident*, Toledo Railway

shipped the locomotive to the second repair shop.  *Id.* at 639.  The second repair shop determined

that repair would cost yet an additional $40,000.00.  At that point, Toledo Railway decided to scrap

the engine.  At trial, Toledo Railway sought damages both for the repair costs incurred and for the

fair market value of the locomotive.  The district court ruled that Toledo Railway could not present

any evidence of the repair costs because under Illinois law Toledo Railway's damages were capped

at the replacement value.  *Id.*  The Seventh Circuit reversed.  It reasoned that a strict application of

Illinois's replacement cap conflicted with the duty to mitigate damages.  *Id.* at 340.  Because Toledo

Railway made reasonable, good faith efforts to mitigate damages, it could recover "both the costs

of attempted but good faith repairs and the diminished value of property" even though it had

inadvertently increased the damages.  *Id.* at 640.  Holding otherwise, the court reasoned, would

discourage plaintiffs from mitigating damages.  *Id.* at 640–41.

 *Toledo* does not support Crompton Greaves's full damage claim.  In that case, once Toledo

Railway knew that the combination of the repair costs already incurred with the expected additional

repair costs would exceed the engine's fair market value at the time of damage, the decision was

made not to pursue additional repairs and instead to seek replacement damages.  The court found

that Toledo Railway had acted consistent with its duty to mitigate damages.  In the present case, by contrast, there is no evidence as to whether Crompton Greaves decided to incur the costs to rebuild the transformer because those costs, combined with the $748,428.76 already incurred, would be less than the transformer's fair market value when it was damaged.[13]  Under *Toledo*, Crompton Greaves would be entitled to damages for both the initial repair costs and the costs of rebuilding the transformer only if they were less than the transformer's fair market value when it was damaged. Crompton Greaves has not produced this evidence.

Texas law, like Illinois law, requires plaintiffs to mitigate damages, *Formosa Plastics Corp.*, 216 S.W.3d at 459.  But the parties have not cited authority on whether under Texas law, a plaintiff's damages are capped at the fair market value of the property at the time it was damaged or whether pursuing additional repairs when the party knows that the combined cost of repairs already incurred and of expected repairs exceeds the fair market value at the time of damage is reasonable.  Shippers Stevedoring cites Fifth Circuit admiralty decisions holding that when the cost of repairs exceeds the fair market value of a vessel, a plaintiff's damages are capped by the vessel's fair market value.  *See King Fisher Marine Serv. Inc. v. NP Sunbonnet*, 724 F.2d 1181, 1185 (5th Cir. 1984) ("It is fundamental that when a vessel is lost or damaged "the owner is entitled to its money equivalent, and thereby to be put in as good a position pecuniarily as if his property had not been destroyed.  To further this policy courts have long held that where a vessel is a total loss the

---

[13]   The relevant record evidence appears to indicate that Crompton Greaves decided to incur additional repair costs based on the fair market value of the transformer when it made the decision, and not based on the fair market value at the time of damage.  Feloni, testified that at the time Crompton Greaves elected to rebuild the transformer, it would have cost between $1,800,000.00 and $2,200,000.00 and taken over fourteen months to rebuild the transformer from Crompton Greaves's plant in Bhopal.  (Docket Entry No. 87, Ex. 7, Edmund Feloni Depo. at 145–46, 148).  To the extent Crompton Greaves knowingly incurred repair costs in excess of the transformer's fair market value, *Toledo* does not provide a basis to recover those damages.

measure of damages is the market value at the time of the loss." (internal citations omitted)); *Ryan Walsh Stevedoring Co. v. James Marine Servs., Inc.*, 792 F.2d 489, 491 (5th Cir. 1986) ("The legal principles are well settled: A vessel is considered a constructive total loss when the cost of repairs is greater than the fair market value of the vessel immediately before the casualty."); *Tug June S v. Bordagain Shipping Co.*, 418 F.2d 306, 307 (5th Cir. 1969) ("Where the injured vessel is not a total loss and repairs are practicable, restitution is the rule of damages in a collision case.  An injured shipowner is entitled to be placed in the same position he occupied before the collision.  The damages assessed should be sufficient to restore the vessel to the condition in which she was at the time the collision occurred.").  These cases, however, do not address whether under Texas law, a plaintiff who reasonably but unsuccessfully tries to mitigate damages through repairs can recover the full cost of his repairs even though it might exceed the fair market value at the time of damage. Summary judgment is not appropriate on the present record.

### b. The Real Party in Interest

Under Rule 17(a)(1) of the Federal Rules of Civil Procedure, "[a]n action must be prosecuted in the name of the real party in interest."  The real party in interest is "the person holding the substantive right sought to be enforced, and not necessarily the person who will ultimately benefit from the recovery."  *In re Signal Intern., LLC*, 579 F.3d 478, 487 (5th Cir. 2009) (citing *Farrell Constr. Co. v. Jefferson Parish, La.*, 896 F.2d 136, 140 (5th Cir. 1990)).  This requirement serves "to assure a defendant that a judgment will be final and that res judicata will protect it from having to twice defend an action, once against an ultimate beneficiary of a right and then against the actual holder of the substantive right."  *Id.* (citing *Farrell Const.*, 896 F.2d at 142); *see also Gogolin & Stelter v. Karn's Auto Imps., Inc.*, 886 F.2d 100, 102 (5th Cir. 1989) ("The purpose of the rule is to

33

prevent multiple or conflicting lawsuits by persons such as assignees, executors, or third-party beneficiaries, who would not be bound by res judicata principles."). "A parent corporation may not pierce its own corporate veil to render it the real party in interest." *Centra, Inc. v. Chandler Ins. Co.*, Nos. 98-6134, 98-6145, 98-6164, 98-6166, 2000 WL 1277672, at *9 (10th Cir. Sept. 7, 2000) (citing *Diesel Sys. v. YIP Shing Diesel Eng'g Co.*, 861 F. Supp. 179, 181 (E.D.N.Y. 1994)).

The record evidence shows that Pauwels America, not Crompton Greaves, incurred most of the costs to ship the transformer to Edison and repair it. Chakravarty testified that "most of the charges were paid by . . . Pauwels America," which paid at least $748,000.00 for shipping the transformer to Edison and paying for the repairs. (Docket Entry No. 74, at 23). Crompton Greaves argues that because it bore the risk of loss, it was the real party in interest. But Crompton Greaves provides no authority that the mere risk of loss is the same as incurring the loss. Pauwels America is the real party in interest with respect to the claim to recover these costs.[14]

## C. Crompton Greaves's Motion for Summary Judgment on Liability

Crompton Greaves argues that because a bailment existed, there is "a rebuttable presumption of negligence" that shifts the burden to Shippers Stevedoring to show "that the damage resulted from some other cause consistent with due care on [its] part." *Sears, Roebuck and Co. v. Wilson*, 963 S.W.2d 166, 169 (Tex. App.—Ft. Worth 1998, no pet.). Crompton Greaves argues that Shippers Stevedoring has not met this burden. In response, Shippers Stevedoring argues that if an implied

---

[14]   Although an action must be prosecuted by the real party in interest, "[t]he court may not dismiss an action for failure to prosecute in the name of the real party in interest until, after an objection, a reasonable time has been allowed for the real party in interest to ratify, join, or be substituted into the action." FED. R. CIV. P. 17(A)(3). "This provision requires the defendant to object in time to allow the opportunity for joinder of the ostensible real party in interest, and the defense may waived if the defendant does not timely object." *In re Signal*, 579 F.3d at 488–89.

contract for bailment existed, a fact issue is raised through expert testimony that the transformer was damaged because of a manufacturing defect, not negligence.

Rick Bonyata's expert report explained why he concluded that the Shock-log on the transformer had been installed incorrectly and was in an improper position, making it susceptible "to extraneous external influences including worker activity and lashing equipment." (Docket Entry No. 84, Ex. A, Bonyata Aff. and Expert Report).  The report concluded that "it is more likely than not that shock measurements in this case are not reliable." (*Id.*).  Bonyata's report stated further that the transformer had "inadequate internal core structural support for the type of shipping support and lashing used to secure" it for shipping.  Based on these findings, and the absence of evidence corroborating the data on the Shock-log recorder, Bonyata reached the following opinions:

> 1.   Reliable shock data is not available to determine which recorded event, if any caused the observed damage to the transformer.
>
> 2.   There is inadequate internal core structural support for the type of shipping support and lashing used to secure the transformer.
>
> 3.   The lack of personnel-reported shock events during transformer movements and handling activities make it unreasonable to rule out internal transformer damage before reaching the Port of Houston.

(*Id.*).  Another expert, Robert Ganser, testified that Crompton Greaves, through "a more robust design, additional bracing, additional insulation, [and] perhaps other methods," could have ensured the transformer's safe arrival.  (*Id.*, Ex. 2, Robert Ganser Depo. at 60).  This evidence raises a triable issue of fact as to whether negligence by Shippers Stevedoring caused the transformer damage.

Crompton Greaves argues that Shivakumar's testimony that he performed IEEE electrical-function tests on the transformer before it left India conclusively rebuts these expert opinions. Shivakumar's testimony that the transformer passed electrical-function tests before any transport does not rebut the expert testimony presented by Shippers Stevedoring.  Neither Bonyata nor Ganser testified about the transformer's condition before shipment.  Instead, the experts testified that the transformer was not properly designed or manufactured and equipped to withstand shipping. Shivakumar's testimony does not establish the absence of fact issues.

Crompton Greaves also argues that testimony from its expert, Dr. David Hullender, conclusively demonstrates that the transformer was damaged on March 7 and March 13.  Dr. Hullender only testified that the transformer damage was consistent with the readings from the Shock-log recorder.  (Docket Entry No. 87, Ex. 6, Dr. David Hullender Depo. at 50).  Dr. Hullender's testimony does not conclusively disprove Bonyata's and Ganser's testimony that the damage could have occurred before these dates.

Neither Shippers Stevedoring nor Crompton Greaves is entitled to summary judgment on Crompton Greaves's breach of contract claim.

### D.    Union Pacific's Motion for Summary Judgment

The third-party defendant, Union Pacific, moved for summary judgment against Shippers Stevedoring.  Union Pacific argues that as a matter of law, Shippers Stevedoring cannot obtain contribution or indemnification for damages attributable to the fourth shock on the Shock-log because Shippers Stevedoring was not a party to Union Pacific's bill of lading,[15] or alternatively,

---

[15]    Union Pacific also alleges that the fourth shock was a "separate event," but does not explain further why this entitles it to summary judgment.  Its motion is denied as to this basis.

because Shippers Stevedoring filed its claim after the 18-month deadline set out by the bill of lading. Union Pacific also argues that the $25,000.00 liability limit applies.

The parties do not dispute that when the fourth shock shown on the Shock-recorder occurred, Union Pacific was transporting the transformer by rail.  Because this was an interstate transfer of goods, the Carmack Amendment applies.  The Amendment, now found at 49 U.S.C. § 11706, creates a national scheme to compensate shippers for goods damaged or lost during interstate shipping.  *See New York, New Haven & Hartford R.R. v. Nothnagle*, 346 U.S. 128, 131 (1958).  The Carmack Amendment subjects a "carrier transporting cargo in interstate commerce to absolute liability for actual loss or injury to property."  *Hughes Aircraft Co. v. N. Am. Van Lines, Inc.*, 970 F.2d 609, 611 (9th Cir. 1992).  A carrier may limit its liability if it complies with certain tariff requirements. (*Id.*).[16] A carrier may limit its liability if it: (1) maintains a tariff within the prescribed guidelines of the Interstate Commerce Commission (now the Surface Transportation Board); (2) obtains the shipper's agreement as to its choice of liability; (3) gives the shipper a reasonable opportunity to choose between two or more levels of liability; and (4) issues a receipt or bill of lading before moving the shipment.  *Hoskins v. Bekins Van Lines*, 343 F.3d 769, 778 (5th Cir. 2003) (citing

---

[16]    The law states:

> a carrier providing transportation or service . . .  may, subject to the provisions of this chapter . . . establish rates for the transportation of property . . . under which the liability of the carrier for such property is limited to a value established by written or electronic declaration of the shipper or by written agreement between the carrier and shipper if that value would be reasonable under the circumstances surrounding the transportation.

49 U.S.C. § 14706(c)(1)(A).

*Rohner*, 950 F.2d at 1081).  Shippers Stevedoring does not raise an argument or identify summary-judgment evidence that Union Pacific's bill of lading failed to comply with these requirements.

The Carmack Amendment also allows carriers to require written notice before claims are filed and to limit the period for filing civil actions.  Section 14706(e)(1) of the Carmack Amendment states:

> A carrier may not provide by rule, contract or otherwise, a period of less than 9 months for filing a claim against it under this section and a period of less than 2 years for bringing a civil action against it under this section.  The period for bringing a civil action is computed from the date the carrier gives a person written notice that the carrier has disallowed any part of the claim specified in the notice.

The Fifth Circuit has held that "Congress intended for the Carmack Amendment to provide *the exclusive* cause of action for loss or damages to goods arising from the interstate transportation of those goods by a common carrier."  *Hoskins v. Bekins Van Lines*, 343 F.3d 769, 778 (5th Cir. 2003) (emphasis in original).

Union Pacific has not cited authority supporting its contention that a nonparty to a bill of lading cannot sue a party to that bill of lading for contribution or indemnification.  The district court's decision in *AIDA Dayton Techs. Corp. v. I.T.O. Corp. of Balt.*, 137 F. Supp. 2d 637 (D. Md. 2001) is instructive.  In *AIDA*, AIDA Dayton Technologies Corporation sued I.T.O. Corporation of Baltimore and Trism Specialized Carriers, Inc. for damage to a machine press that fell from a Trism tractor trailer during intestate shipment.  *Id.* at 638.  AIDA had hired Trism to transport the press from a port to an inland distribution by tractor-trailer.  Wilhelmsen Lines, the company who shipped the press from Japan, hired I.T.O. to unload the press at port and load it onto Trism's tractor-trailer. *Id.* at 639.  While Trism was transporting the press, it fell off the trailer.  There was no bill of lading covering the work I.T.O. performed, but AIDA and Trism agreed to a bill of lading shortly after the

press off the trailer.  *Id.* at 639–40.  I.T.O filed a cross-claim against Trism, alleging that AIDA's damages were due to Trism's negligence.  Trism moved for summary judgment that I.T.O did not have standing to assert claims against Trism because when Trism took possession of the press, I.T.O. was neither its shipper, consignor, consignee, or owner.  Trism also sought summary judgment that I.T.O.'s claims were barred under the limitations provisions in the bill of lading.  *Id.* at 646.  The court denied summary judgment.  As to standing, the court reasoned that "standing under the Carmack Amendment extends to 'one who, by some lawful transaction, has succeeded to the shipper's rights,' and 'failure to hold a bill of lading, upon proof of [a] right otherwise to recover,' does not 'defeat that right.'"  *Id.* (quoting *Bowden v. Philadelphia, B & W.R.*, 28 Del. 146, 91 A. 209 (1914)).  Because I.T.O. was an agent of Wilhelmsen Lines, which had "succeeded to [AIDA's] rights in the press machine" under its ocean bill of lading with AIDA, the court was "satisfied that I.T.O. [] presented evidence of a 'right to recover' against Trism under the Carmack Amendment." *Id.* at 647.

In the present case, the record is unclear as to the relationship between Vision Logistics and Shippers Stevedoring.  Alomex hired both Vision Logistics and Shippers Stevedoring for the inland transport of the transformer.  There is evidence that Vision Logistics instructed Shippers Stevedoring about arranging for delivery of the transformer to Union Pacific's railcar.  The record is inadequate for this court to determine whether Union Pacific is entitled to judgment that Shippers Stevedoring has a right to seek its indemnification and contribution even though it was not a party to the bill of lading.[17]

---

[17]   Because the record and briefing is limited as to this issue, Union Pacific's motion for summary judgment that Shippers Stevedoring does not have standing to assert claims for indemnification and contribution is denied without prejudice to reurging if appropriate at a later stage in this case.

Assuming that Shippers Stevedoring has standing to assert claims for indemnification and contribution against Union Pacific, the record shows that those claims are not barred by the claim filing and limitation requirements in Union Pacific's bill of lading. While the Carmack Amendment allows a carrier to require a claim to be filed in writing and to limit the time for filing a claim, courts have held that these limits do not apply to nonparties to the bill of lading. *See AIDA*, 137 F. Supp. 2d at 646 (rejecting summary judgment based on limitations provisions in bill of lading because claims for indemnification and contribution do not accrue until its liability for damage is determined by judgment or payment); *Dominion Res. Servs., Inc. v. 5K Logistics, Inc.*, 2010 WL 679845, at *3 (E.D. Va. Feb. 24, 2010) ("While the failure to properly preserve a right of action by complying with these time limits warrants summary judgment in favor of a carrier, where a litigant is not a party to a bill of lading, these time limits have been found inapplicable by a number of courts."); *Taft Equip. Sales Co. v. Ace Transp.*, 851 F. Supp. 1208, 1213 (N.D. Ill. 1994) (broker not bound by time limit). Courts have also held that claims for indemnification and contribution do not accrue for limitations purposes until the third-party plaintiff's liability for damages is established. *See Hercules Inc. v. Stevens Shipping Co., Inc.*, 698 F.2d 726, 732 (5th Cir. 1983) (indemnity claim arises only after the party seeking indemnity is held liable); *AIDA*, 137 F. Supp. 2d at 637. To the extent Shippers Stevedoring can assert indemnification and contribution claims against Union Pacific, those claims are not barred by the bill of lading's notice and limitations provisions.

The bill of lading's liability limits are enforceable. Courts have held that a bill of lading's liability limits are enforceable against nonparties. *See Carman Tool & Abrasives, Inc. v. Evergreen Lines*, 871 F.2d 897, 900-01 (9th Cir. 1989) (allowing a carrier to rely on liability limits contained in its bill of lading in an action by a plaintiff not a party to the bill of lading "so long as the bill of

lading, on its face, provides adequate notice of the liability limit and an opportunity to declare a higher value"); *AIM Controls, LLC*, H-08-cv-1662, 2008 WL 4925028, at * (S.D. Tex. Nov. 17, 2008) (holding that a nonparty plaintiff's recovery is limited to the bill of lading amount because the Carmack Amendment "provides the exclusive remedy for damage to goods in interstate commerce"); *Banos v. Eckerd Corp.*, 997 F. Supp. 756, 763 (E.D. La. 1998) (holding that a drugstore customer who owned photos being shipped could not recover more than the liability limit set forth in the bill of lading signed by the drugstore acting as the shipper); *Gulf Rice Arkansas v. Union Pac. R.R. Co.*, 376 F. Supp. 2d 715, 722–23 (S.D. Tex. 2005) (finding that the cargo owner was bound by the liability limit selected by the shipper, who drafted the bill of lading). Shippers Stevedoring does not argue or identify summary-judgment evidence that Union Pacific's bill of lading is not in compliance with the Carmack Amendment's liability-limit requirements. This court grants summary judgment that Union Pacific's $25,000.00 liability limit is enforceable.

### E.       The Motion to Sever

Crompton Greaves moved for a separate trial of Shippers Stevedoring's third-party complaint against Union Pacific under Federal Rule of Civil 42(b).[18] Crompton Greaves argues that severance is appropriate because extensive discovery has concluded on the underlying claim and dispositive motions have been filed. Union Pacific joined in Crompton Greaves's motion, arguing that without severance, it will be prejudiced because it could not designate experts or conduct discovery. Union

---

[18]  "The procedure authorized by Rule 42(b) should be distinguished from severance under Rule 21. The difference between the two is stated easily. Separate trials of claims originally sued upon together will result in the entry of one judgment, but severed claims become entirely independent actions to be tried, and judgment entered thereon, independently." Charles Alan Wright & Arthur R. Miller, Fed. Prac. & Proc. (3d ed.) § 2387 (2010). Crompton Greaves labels its motion as one for severance, but it only argues for separate trials under Rule 42(b). This court considered Crompton Greaves's motion under the Rule 42(b) standard.

Pacific emphasizes that it needs time to prepare its defense.  Shippers Stevedoring opposes severance as both inefficient and prejudicial to it.

Rule 42(b) allows a district court to order separate trials "to expedite and economize, for convenience, or to avoid prejudice." *Alaniz v. Zamora-Quezada*, 591 F.3d 761, 773 (5th Cir. 2009). "'Whether to conduct separate trials under the Rule is 'a matter left to the sound discretion of the trial court on the basis of circumstances of the litigation before it.'" *Id.* at 773–74 (citing CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FED. PRAC. & PROC. (3d ed.) § 2388 (2010)).  "The burden is on the party seeking separate trails to prove that separation is necessary." *Houston McLane Co. v. Connecticut Gen.*, No. Civ. A. H-06-1508, 2006 WL 3050812, at *2 (S.D. Tex. Oct. 24, 2006) (citing WRIGHT & MILLER § 2388).  A leading treatise notes that:

> The provisions for separate trials in Federal Rule 42(b) is intended to further many significant policies — the parties' convenience, the avoidance of delay and prejudice, and the promotion of the ends of justice.  It is in the interest of efficient judicial administration that is to be controlling under the rule, rather than the wishes of the parties. The piecemeal trial of separate issues in a single lawsuit or the repetitive trial of the same issue in severed claims is not to be the usual course.

*Id.* § 2388.

Efficient judicial administration weighs heavily in favor of denying the Rule 42(b) motion. While extensive discovery has been conducted in the underlying lawsuit, much of that discovery relates to Shippers Stevedoring's claims against Union Pacific.  Shippers Stevedoring's claims against Union Pacific will also involve many of the same witnesses, including experts, that might testify at the underlying trial.  The need to allow Union Pacific to designate experts or otherwise complete its trial preparations may be addressed without separate trials.  The motion is denied.

## IV.    Shippers Stevedoring's Motion for an Adverse Inference Instruction

Shippers Stevedoring moved for an adverse inference instruction against Crompton Greaves that a second shock recorder, a "LoGee 10" existed and that the data that would have been recovered from the LoGee 10 would conflict with the data from the Shock-log.  (Docket Entry No. 77, at 3). Shippers Stevedoring bases its motion on the photograph taken by Captain Rego on March 7 showing two shock recorders on a transformer.  Shippers Stevedoring's photography expert, Dr. Carey Murphy, testified that this photograph was taken "in sequence" with other photographs of the transformer at issue in this case. Shippers Stevedoring also points to testimony from Crompton Greaves's experts, Dr. Hullender and Feloni, that transformers shipped overseas should be equipped with two shock recorders.  (*Id.*, Ex. F, Dr. Hullender Depo. at 66; Ex. G, Edmund Feloni Depo. at 21).

Crompton Greaves responds that testimony from its Bhopal-plant manager, Shivakumar, that only one Shock-log was attached to the transformer, establishes a disputed fact issue as to whether there was a second shock recorder.  Crompton Greaves points to Captain Rego's testimony that he was surveying multiple Crompton Greaves shipments on the day he took the photographs, and that he believed the picture showing two shock recorders was of a different transformer than the one at issue here.  Captain Rego also testified that he was not sure he took the photograph because it showed a shock recorder that did not have a case, which is different from Crompton Greaves shock recorders he has photographed.  (Docket Entry No. 85, Ex. 1, Captain Rego. Depo. at 52–53, 165–69).

"Spoliation is the destruction or the significant and meaningful alteration of evidence." *Rimkus Consulting Grp. v. Cammarata*, 688 F. Supp. 2d 598, 612 (S.D. Tex. 2010).  Allegations of spoliation, including the destruction of evidence in pending or reasonably foreseeable litigation, are

addressed in federal courts through applicable rules or statutes.  A court may apply its inherent power to regulate the litigation process if the alleged conduct occurs before a case is filed or if there is no statute or rule that adequately addresses the conduct.[19]  *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 43–46 (1991); *Natural Gas Pipeline Co. of Am. v. Energy Gathering, Inc.*, 2 F.3d 1397, 1408 (5th Cir. 1993) (summary calendar).  A court's inherent power is "interpreted narrowly, and its reach is limited by its ultimate source—the court's need to orderly and expeditiously perform its duties."  *Newby v. Enron Corp.*, 302 F.3d 295, 302 (5th Cir. 2002) (footnote omitted) (citing *Chambers*, 501 U.S. at 43).

Crompton Greaves argues that there is insufficient evidence to find that a second shock recorder was ever on this transformer or that, assuming it existed, Crompton Greaves destroyed it in bad faith.  As a general rule, in the Fifth Circuit, the severe sanctions of granting default judgment, striking pleadings, or giving an adverse inference instruction may not be imposed unless there is evidence of "bad faith."  *Condrey v. SunTrust Bank of Ga.*, 431 F.3d 191, 203 (5th Cir. 2005); *King v. Ill. Cent. R.R.*, 337 F.3d 550, 556 (5th Cir. 2003); *United States v. Wise*, 221 F.3d 140, 156 (5th Cir. 2000).  "'Mere negligence is not enough' to warrant an instruction on spoliation." *Russell v. Univ. of Tex. of Permian Basin*, 234 F. App'x 195, 208 (5th Cir. 2007) (unpublished) (quoting  *Vick v. Tex. Employment Comm'n*, 514 F.2d 734, 737 (5th Cir. 1975); *see also King*, 337 F.3d at 556 ("King must show that ICR acted in 'bad faith' to establish that it was entitled to an adverse inference."); *Vick v. Tex. Employment Comm'n*, 514 F.2d at 737 ("The adverse inference to be drawn from destruction of records is predicated on bad conduct of the defendant.  Moreover,

---

[19]    In diversity suits, federal courts apply federal evidence rules rather than state spoliation law. *Condrey v. SunTrust Bank of Ga.*, 431 F.3d 191, 203 (5th Cir. 2005).

the circumstances of the act must manifest bad faith.  Mere negligence is not enough, for it does not

sustain an inference of consciousness of a weak case." (quotation omitted)).

The present record is insufficient to support a finding of intentional, bad faith destruction as

needed for an adverse inference instruction.  There is conflicting testimony as to whether the

photograph Shippers Stevedoring relies on was a photograph of the transformer at issue in this

litigation.  Dr. Murphy testified that the photograph was taken "in sequence" with other photographs

of the transformer at issue and that it was taken between 12:41 and 3:38 p.m. on March 7, 2007.

(Docket Entry No. 77, Ex. B, Dr. Murphy Report).  Captain Rego testified that he did not believe

the photograph was of the same transformer, noting that he surveyed other transformers as well as

other cargo on March 7 and that pictures of different cargo pieces often get mixed up.  (Docket Entry

No. 85, Ex. 1, Captain Rego Depo. at 52).  Captain Rego also testified that he did not recognize the

second shock recorder shown in the photograph as one he had seen before because it was not

covered with a protective case.  (*Id.*, 53–54; 168–69).[20]  Testimony from Crompton Greaves's

designated expert, Chakravarty, and its Bhopal-plant manager, Shivakumar, further supports

Crompton Greaves's position that only one shock recorder was attached to the transformer.

Chakravarty testified that while he was certain the Shock-log recorder was attached to the

transformer, he did not believe the Logee 10 was attached.  (Docket Entry No. 77, Ex. E,

Chakravarty Depo. at 33–35, 51–52).  Shivakumar testified that he installed only one shock recorder

on the transformer.  (Docket Entry No. 85, Ex. 2, Shivakumar Depo. at 77).  Shippers Stevedoring

---

[20]   Shippers Stevedoring points out that Captain Rego testified that he inspected a transformer
manufactured by Siemens aboard the *Industrial Destiny*.  Shippers Stevedoring argues that this
transformer could not be the transformer in the photograph because the Siemens transformer was encased
in a wooden frame.  Captain Rego testified that the Siemens transformer was one of several transformers
he surveyed on that date.  He also testified that pictures can be mixed up.  Even if the picture was not of
the Siemens transformer, a fact issue exists.

points out that the transformer was designed to have two shock recorders attached and that Crompton Greaves's own experts testified that attaching two shock recorders is necessary.  (Docket Entry No. 77, Exs. D, Shivakumar Depo. at 167–68; F, Dr. Hullender Depo. at 66–67; G, Feloni Depo. at 21).  None of this evidence demonstrates that a second shock recorder was attached.  Given the record, Shippers Stevedoring is not entitled to the adverse inference instruction it seeks.

## V.    Conclusion and Order

Shippers Stevedoring's motion for partial summary judgment that COGSA's one-year statute of limitations bars the plaintiff's claims or that COGSA limits the plaintiff's damages to $500.00 is denied, (Docket Entry No. 65).  Shippers Stevedoring's motion to strike is denied, (Docket Entry No. 71).  Shippers Stevedoring's motion for summary judgment on Crompton Greaves's claims is denied, (Docket Entry No. 74).  Shipper Stevedoring's motion for an adverse inference instruction is denied, (Docket Entry No. 77).

Crompton Greaves's motion for partial summary judgment on liability is denied, (Docket Entry No. 76).  Crompton Greaves's and Union Pacific's motion to sever is denied, (Docket Entry No. 75).

Union Pacific's motion for summary judgment is granted in part and denied in part, (Docket Entry No. 99).  Union Pacific's motion for summary judgment is denied as to its arguments that Shippers Stevedoring does not have standing and that Shippers Stevedoring's claims are barred by limitations provision in Union Pacific's bill of lading.  It is granted as to Union Pacific's argument that its damages are limited to $25,000.00.

A status and scheduling conference is set for **March 28, 2011** at 8:30 a.m. in Courtroom 11-B.

SIGNED on March 9, 2011, at Houston, Texas.

Lee H. Rosenthal
United States District Judge